# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| B.R.S., a minor, by and through his Guardian ad Litem, Ronald Sznaider, individually and as successor-in-interest to the claims of Joshua Sznaider, <br><br>　　　　　　　Plaintiff, <br><br>　　v. <br><br>CITY OF PALM SPRINGS, et al., <br><br>　　　　　　　Defendants. | Case No. EDCV 13-01644  DMG (SPx) <br><br>**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** <br>**[32]** |

　　This matter is before the Court on Defendants City of Palm Springs ("the City"), Cary Carrillo, Paul Abshire, and Marc Melanson's motion for summary judgment or, in the alternative, partial summary judgment.  [Doc. # 32.]  A hearing was held on the motion on January 23, 2015.  Having duly considered the parties' written submissions and oral argument, the Court now renders its decision.  For the reasons set forth below, Defendants' motion for partial summary judgment is **GRANTED in part** and **DENIED in part**.

# I.

# FACTUAL BACKGROUND

As it must on this motion for summary judgment, the Court sets forth the material facts and views all reasonable inferences to be drawn from them in the light most favorable to Plaintiff B.R.S., a minor, by and through his Guardian Ad Litem Ronald Sznaider, the non-moving party.[1] These facts are uncontroverted, except where indicated.

On October 2, 2012, the Palm Springs Police Department received several 911 calls reporting that a white male (later identified as the decedent Joshua Sznaider), who appeared "mentally altered," was acting erratically. (Defendants' Reply to Plaintiff's Opposition to Defendants' Separate Statement ("D's Reply") ¶ 1; *see* Declaration of Caroline A. Byrne ("Byrne Decl.") ¶ 3, Exh. H (De La Campa Depo. at 33:19-34:3, 34:15); Byrne Decl. ¶ 4, Exh. I (Kiley Depo. at 27:14-15).) Sznaider was running in the middle of the street. (D's Reply ¶¶ 3, 4; *see* Byrne Decl. ¶ 2, Exh. G ("Palm Springs PD Event Record"); Byrne Decl. ¶ 3, Exh. H (De La Campa Depo. at 53:9-21, 203:17-204:2, 227:15-23).) In the span of a few minutes, he also climbed a tree and entered Windsor Court, a facility for the elderly, and yelled, "They're going to shoot me." (D's Reply ¶ 8; *see* Byrne Decl. ¶ 2, Exh. G ("Palm Springs PD Event Record"); Byrne Decl. ¶ 4, Exh. I (Kiley Depo. at 47:20-55:14).) He stayed for about two minutes before a "private

---

[1] The parties object on various evidentiary grounds, including relevance, to the opposing party's evidence. [*See* Doc. ## 46, 52.] To the extent that the Court relies on each party's facts, it overrules blanket objections that the facts are irrelevant. It also rejects blanket objections that the facts, as stated, are vague. The Court addresses the parties' other evidentiary objections only to the extent it relies on the corresponding evidence.

Defendants also object to several of Plaintiff's documents because they were filed one day late, with the exception of Plaintiff's Objections to Defendants' Evidence, which was filed 12 days late. [Doc. ## 47, 54.] L.R. 7-19; L.R. 7-12. As the Court prefers to consider the merits of the motion and Defendants have not asserted any prejudice to them resulting from the late filings, the Court declines to apply Local Rule 7-9 as a bar to considering Plaintiff's opposition papers in their entirety. Plaintiff is admonished, however, to comply with the Local Rules.

person," Andrew Kiley, got him to leave Windsor Court. (*See* Byrne Decl. ¶ 2, Exh. G ("Palm Springs PD Event Record").) Officer Carrillo responded to the call. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 83:14-25).) When he approached Sznaider, Sznaider initially backed away from him but stopped when Carrillo commanded him to stop. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 105:2-22); Declaration of Christopher C. Vader ("Vader Decl.") ¶ 10, Exh. T (Kiley Depo. at 82:17-83:2).) Carrillo grabbed Sznaider's upper right arm with his right hand and his shoulder with his left hand and guided Sznaider out of traffic and to the sidewalk. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 108:17-110:17).) Sznaider complied with Carrillo's command and sat down in the dirt next to the sidewalk. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 118:9-25).) Carrillo then put him in a rear wrist lock, with Sznaider's triceps in his left hand and Sznaider's right wrist in his right hand. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 122:20-123:24).) It was at this time that Carrillo became aware of Sergeant Melanson's presence. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 125:19-23).) Melanson grabbed a hold of Sznaider's left arm and brought the arm into the rear wrist lock position. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 127:1-17).)

Before the officers could handcuff Sznaider, however, Sznaider stood up very quickly. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 139:16-25).) As he stood, Sznaider pulled Carrillo toward the center and off his feet. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 141:4-5).) Carrillo crashed into Melanson, causing Melanson to lose his grip on Sznaider. (*See* Byrne Decl. ¶ 7, Exh. L (Melanson Depo. at 107:18-22).) Carrillo, during this time, maintained his grasp on Sznaider's arm, however, and brought his left hand to Sznaider's left shoulder, pulling himself onto Sznaider's back. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 145:3-20).) Carrillo then pulled Sznaider towards the right, tackling Sznaider to the ground. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 147:23-150:24); Vader Decl. ¶ 12, Exh. V (De La Campa Depo. at 118:8-14).) Carrillo's right arm hit the street as they fell. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 152:25-153:9).)

When they landed, Sznaider was face down with Carrillo on his back and Carrillo's arms around him. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 153:11-13).) Sznaider then lifted the back end of his body, lifting Carrillo into the air, but Carrillo was able to maintain his hold around Sznaider and avoid landing upside down or on his back on the street. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 157:22-161:5 ).) Instead, Carrillo's face hit the back of Sznaider's head, and Carrillo's head hit the street. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 161:21-23).) Carrillo's chest remained on Sznaider's back, however, and his knees were on Sznaider's left side. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 164:9-10).) Carrillo is 5'11 ½" and weighs between 200 and 205 pounds, about the same size as Carrillo in Carrillo's estimation. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 141:11-21).) Abshire, Melanson, and Kiley assisted Carrillo in containing Sznaider. (*See* Byrne Decl. ¶ 6, Exh. K (Abshire Depo. at 160:16-20); Byrne Decl. ¶ 4, Exh. I (Kiley Depo. at 125:3-18, 141:2-7).) Melanson, who is slightly smaller than Carrillo, was near Sznaider's hindquarters, placing his weight on Sznaider's hips to keep his body prone on the pavement. (*See* Byrne Decl. ¶ 7, Exh. L (Melanson Depo. at 126:21-24); Byrne Decl. ¶ 6, Exh. K (Abshire Depo. at 145:22-24).) Abshire meanwhile attempted to get Sznaider's right hand into cuffing position. (*See* Byrne Decl. ¶ 6, Exh. K (Abshire Depo. at 160:16-20).) Kiley, who is 5'9" and 200 pounds, wrapped his arms around Sznaider's legs at the hips and put his legs on Sznaider's ankles to keep Sznaider from breaking free. (*See* Byrne Decl. ¶ 4, Exh. I (Kiley Depo. at 56:5-8, 125:12-15).)

Carrillo said, "Somebody get him cuffed." (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 167:16-21, 168:4-5, 169:13-15).) Carrillo heard Melanson say, "Taser him." (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 169:20-22, 170:3-5).) Abshire, after retrieving the Taser from Carrillo's belt, stated, "Taser, Taser, Taser," and then applied the Taser directly to Sznaider twice, using the drive-stun mode. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 180:2-5, 189:20-190:1-5); Byrne Decl. ¶ 4, Exh. I (Kiley Depo. at 140:19-21).) The first application caused Sznaider to tense up until it was removed.

1  (*See* Byrne Decl. ¶ 4, Exh. I (Kiley Depo. at 145:6-7).) Then Sznaider continued pushing
2  forward. (*See* Byrne Decl. ¶ 4, Exh. I (Kiley Depo. at 145:8-9).) After the second
3  application of the Taser, however, Kiley, who was holding Sznaider's legs, asserts that
4  Sznaider went unconscious and stopped fighting. (*See* Byrne Decl. ¶ 4, Exh. I (Kiley
5  Depo. at 145:20-24, 155:7-21).) Carrillo, on the other hand, claims that nothing changed
6  after the second application of the Taser and that Sznaider continued pushing to get out
7  from under Carrillo. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 183:11-25, 190:21-
8  25).)

9  After the second application of the Taser, Carrillo applied the carotid control hold
10 because he claims that he was starting to lose his grip on Sznaider. (*See* Byrne Decl. ¶ 4,
11 Exh. J (Carrillo Depo. at 196:2-17).) He applied the hold for five to ten seconds, or 15 to
12 20 seconds. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 208:22-209:1; 246:8-16).)
13 Carrillo then rolled him over, noted that Sznaider was not breathing, and let go of
14 Sznaider's neck. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 223:22-224:11); Byrne
15 Decl. ¶ 3, Exh. H (De La Campa Depo. at 174:1-7).) Sznaider's lips were purple, there
16 was white mucus around his mouth, his tongue was hanging out of his mouth, and his
17 eyes were halfway open. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 224:6-9).)
18 Melanson began CPR, and Sznaider took about four breaths before he stopped breathing
19 again. (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 241:2-5).) Officer Vega
20 administered a second round of CPR, after which Sznaider began breathing on his own.
21 (*See* Byrne Decl. ¶ 4, Exh. J (Carrillo Depo. at 243:17-244:2).)

22 Sznaider died on October 7, 2012. (*See* Byrne Decl. ¶ 10, Exh. O ("Amended
23 Death Certificate").) The coroner listed the cause of death as "Hypoxic Ischemic
24 Encephalopathy" due to "Methamphetamine Intoxication," but noted "Cardiomegaly and
25 physical altercation with law enforcement" under "Other Significant Conditions." (*See*
26 Byrne Decl. ¶ 10, Exh. O ("Amended Death Certificate").) Sznaider had 2.590
27 milligrams per liter of methamphetamines in his blood, more than the average fatal level
28 for methamphetamine. (*See* Byrne Decl. ¶ 11, Exh. P (Bawardi Depo. at 30:19-20, 93:6-

22).) Following the incident, Lieutenant Mitch Spike carried out the investigation of the incident and sent the case to the District Attorney's office for review. (*See* Vader Decl. ¶ 22, Exh. FF ("Report by Mitch Spike").)

## II.
## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.

Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (quoting Fed. R. Civ. P. 56(c), (e) (1986)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

///
///
///

## III.
## DISCUSSION

Plaintiff alleges the following claims against Defendants: (1) excessive force and denial of timely medical care in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983; (2) substantive due process violation under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; (3) violation of Cal. Civ. Code section 52.1; (4) battery; and (5) wrongful death / negligence. [Doc. ## 29-1, 35.]

Defendants move for summary judgment on all claims in Plaintiff's Second Amended Complaint ("SAC") [Doc. # 29] or, in the alternative, for partial summary judgment as to some of Plaintiff's claims. (Mot. at ii.)

Plaintiff does not oppose the motion with respect to the allegation that Defendants denied timely medical care to the Sznaider and the claim for violation of substantive due process under the Fourteenth Amendment. (Opp'n at 10.) Nor does Plaintiff oppose Defendants' motion with respect to the *Monell* claim on the theory that the City failed to train its officers. With respect to those claims, summary judgment is therefore **GRANTED**.

### A. Plaintiff's Excessive Force in Violation of Fourth Amendment Claim

#### 1. Legal Standard

"Fourth Amendment claims of excessive or deadly force are analyzed under an objective reasonableness standard." *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372, 381, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)). When evaluating a Fourth Amendment claim of excessive force, a court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them" based on the totality of the circumstances. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)); *Espinosa*, 598 F.3d at 537. The inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Glenn*, 673 F.3d at 871 (quoting *Graham*, 490 U.S. at 396). The

inquiry is "highly fact-intensive" and involves no *per se* rules. *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011).

"[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Glenn*, 673 F.3d at 871 (quoting *Graham*, 490 U.S. at 396-97) (internal quotation marks omitted). The Court adopts "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted).

The analysis is done in three steps. First, the Court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Espinosa*, 598 F.3d at 537 (internal quotation marks omitted). Second, the Court must evaluate the government's interest by assessing factors identified by the Supreme Court in *Graham*: "(1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Id.*

Third, the court "balance[s] the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* (quoting *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)). Ultimately, the court "must balance the force that was used by the officers against the need for such force to determine whether the force used was 'greater than is reasonable under the circumstances.'" *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002)).

The Ninth Circuit has held that "[b]ecause the reasonableness standard 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Torres*, 648 F.3d at 1125 (quoting *Santos*, 287 F.3d at 853). "This is because such cases almost always turn on a jury's credibility determinations." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

**2.     Severity of Intrusion**

Here, Abshire applied a Taser in drive-stun mode twice to Sznaider and Carrillo used the carotid control hold on Sznaider for five to ten, or fifteen to twenty, seconds. With respect to the use of the Taser, the Ninth Circuit has not determined the quantum of force used when a Taser is used in drive-stun mode. *See Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011). The court in *Mattos* reasoned, however, that it was not necessary to decide the issue in order to assess the reasonableness of the Tasing, so long as the court kept in mind "the magnitude of the electric shock at issue and the extreme pain [] experienced" by the individual. *See id.*

The carotid control hold is a severe level of force. *See Atkinson v. Cnty. of Tulare*, 790 F. Supp. 2d 1188, 1203 (E.D. Cal. 2011) ("[F]orce that creates a substantial risk of causing death or serious bodily injury is deadly force.") (quoting *Smith*, 394 F.3d at 693) (internal quotation marks omitted). This hold is "designed to render a person temporarily unconscious." (*See* Declaration of Roger Clark ("Clark Decl.") at 14.) Even properly applied, the carotid control hold "carries with it the potential dangers of cardiac arrest, stroke, and brain damage – and can result in death." (*Id.*) Because of the heightened risk of death or serious bodily injury, the carotid control hold is a severe level of force.

### 3. **Government's Interest**

The "most important single element of the . . . factors" identified in *Graham* is whether the suspect poses an immediate threat to the safety of the police officers or others. *Smith*, 394 F.3d at 702 (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). Here, the threat that Sznaider posed to the police officers and others is a triable issue. No evidence indicates that Sznaider was armed. Though Sznaider put himself and others in danger when he ran into traffic, that threat to safety ceased at the moment that Carrillo guided Sznaider to the sidewalk.

Defendants argue that Sznaider again posed a threat to safety, this time of the officers, when he resisted arrest. But even then, after viewing the facts in the light most favorable to Plaintiff, there is a triable issue as to the severity of the threat Sznaider posed, given that four men of almost equal size restrained him after he was tackled by

1  Carrillo in the street. Carrillo, who was closest in size to Sznaider, lay on Sznaider's
2  back while Sznaider lay prone in the street. Melanson, who is slightly smaller than
3  Carrillo, placed his weight on Sznaider's hips. Kiley, who weighed 200 pounds, wrapped
4  his arms around Sznaider's upper legs and placed his legs on Sznaider's ankles. Finally,
5  Abshire attempted to gain control of Sznaider's right arm.

6  Moreover, there is a genuine issue of material fact as to the moment when Sznaider
7  stopped resisting. According to Kiley, the witness who was holding Sznaider's legs
8  during the confrontation, Sznaider went unconscious and stopped struggling after the
9  second application of the Taser. Carrillo claims, however, that Sznaider struggled to
10 escape until he applied the chokehold for five to ten, or fifteen to twenty, seconds.
11 Defendants argue that Kiley was unaware that Carrillo had applied a carotid hold, and
12 thus that the carotid control hold resulted in Sznaider ceasing to struggle. After drawing
13 all reasonable inferences in Plaintiff's favor from Kiley's testimony, however, the Court
14 finds it still a triable fact as to whether Sznaider ceased resisting immediately after the
15 second application of the Taser, thus rendering Sznaider not a threat to safety and
16 Carrillo's application of the chokehold unnecessary.

17 As to the remaining factors, it is undisputed that Sznaider resisted arrest as the
18 officers attempted to put handcuffs on him. As discussed *supra*, there is a genuine issue
19 of material fact as to how much Sznaider was resisting and when he stopped resisting.
20 *See Espinosa*, 598 F.3d at 537 ("Where the suspect poses no immediate threat to the
21 officer and no threat to others, the harm resulting from failing to apprehend him does not
22 justify the use of deadly force to do so.") (quoting *Tennessee v. Gardner*, 471 U.S. 1, 11-
23 12, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)) (alteration in original). There is also a triable
24 issue as to whether Sznaider was even resisting *arrest* after he fell to the ground.
25 According to Plaintiff's expert, the weight of an officer kneeling or lying on an
26 individual's back can make it difficult for an individual to breathe. (*See* Clark Decl. at
27 16.) "The greater the weight or more intense the compression, the harder it becomes to
28 breathe. As a result, the suspect struggles more violently, and untrained officers respond

by using more force." (*Id.*)  Thus, when the facts are viewed in the light most favorable to Plaintiff, Sznaider's "resistance" may have actually been his attempt to get out from under the suffocating force of 200 pounds of weight that Carrillo was placing on his back.

With respect to the severity of the crime charged, Sznaider was suspected of disturbing the peace.  He appeared to be mentally disturbed and frightened, and was under the influence of drugs.

### 4. **Balancing**

Having considered the totality of the circumstances, and drawing all reasonable inferences in favor of Plaintiff, the Court concludes that there are triable issues as to whether the officers used excessive force.  "If the evidence, reviewed in the light most favorable to [Plaintiff], could support a finding of excessive force, then the defendants are not entitled to summary judgment."  *Smith*, 394 F.3d at 701.  The Ninth Circuit has instructed district courts to grant summary judgment motions in excessive force cases "sparingly," *Torres*, 648 F.3d at 1125, because "such cases *almost always* turn on a jury's credibility determinations."  *Smith*, 394 F.3d at 701 (emphasis added).

In this case, Plaintiff has identified material facts that create a genuine dispute regarding the critical facts of this case, and which could support a reasonable jury's finding that Abshire and Carrillo did not perceive an immediate threat of death or serious physical injury when Abshire applied the Taser, and Carrillo applied the carotid control hold, to Sznaider.  Sznaider was unarmed when the officers apprehended him.  After Carrillo tackled him to the ground, four men of almost equal size to Sznaider held him down as he lay prone on the ground.  The resistance that Carrillo perceived may in fact have been Sznaider's attempt to escape the suffocating weight of a 200-pound officer lying on his back and pinning him to the ground.  Moreover, before Melanson suggested using the Taser on Sznaider, Carrillo said, "Someone get him cuffed," which supports an inference that at that moment, from Carrillo's perspective, Sznaider was sufficiently under control that someone other than Carrillo would have been able to handcuff him.

According to Defendants' use of force expert, "POST defines four categories of behavior and a range of appropriate officer responses to gain control compliance": cooperative, resistive (passive and active), and combative. (*See* Clark Decl. at 12-13.) When a suspect is resistive, the appropriate methods of compliance include "[f]irm grip, [c]ontrol holds and low levels of pain compliance." (*Id.*) When a suspect is combative, however, "[o]fficers have the right to self-defense and can use necessary tools (baton, OC spray, taser, etc.)." (*Id.*) Here, drawing all inferences in Plaintiff's favor, a reasonable factfinder could conclude that Sznaider was resistive, rendering the dual application of the Taser unnecessary. Under this scenario, the application of the chokehold would certainly be excessive—and all the more so if Sznaider stopped resisting after the second Taser application but before the use of the carotid control hold.

With respect to Melanson, although he did not directly apply the Taser or the carotid control hold, he did suggest the use of the Taser. "A supervisor may be held liable under § 1983 if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418 (9th Cir. 2003) (internal citation and quotation marks omitted) (finding sergeant's order to use pepper spray against the plaintiff sufficient involvement in the alleged unconstitutional violation such that summary judgment in his favor was inappropriate). As Melanson and Abshire are both sergeants, however, Melanson was not Abshire's supervisor and cannot reasonably be held liable for suggesting, rather than ordering, the use of the Taser. A reasonable factfinder could find Melanson liable for failing to intervene when Carrillo applied the carotid control hold. In *Lolli*, the court found that a sergeant's failure to bring his subordinates under control could support liability under § 1983 and thus that the sergeant was not entitled to summary judgment. *Id.* Likewise, here, Melanson failed to bring his subordinate, Carrillo, under control. Therefore, genuine issues of material fact exist with respect to all of the officers.

///

### 5. **<u>Qualified Immunity</u>**

The doctrine of qualified immunity has been generally defined as follows:

> The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

*Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (citations and quotation marks omitted).

To survive a defendant's invocation of qualified immunity, a plaintiff must demonstrate that two prongs are satisfied: (1) the official's actions violated a constitutional right; and (2) the right was "clearly established" at the time of the officer's conduct. *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

Here, the Court has already determined that Plaintiff has raised genuine disputes of material fact as to whether the officers' actions violated Sznaider's Fourth Amendment right to be free from excessive force.

With respect to the second prong, the qualified immunity defense requires an examination of whether the right the official has violated was so clearly established "that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "The

determination whether a right was clearly established 'must be undertaken in light of the specific context of the case, not as a broad proposition.'" *Nelson*, 685 F.3d at 883 (quoting *Saucier*, 533 U.S. at 201).

When the qualified immunity defense is raised in the context of an excessive force claim, the issue is

> whether, in using excessive force, the officer made a reasonable mistake as to the legality of his actions. We assume, *arguendo*, that [the officer] thought that the force he used was not excessive; however, that is not the issue. Rather, the question is whether [the officer's] use of force was premised on a *reasonable* belief that such force was lawful, or, as the Supreme Court recently put it: whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Deorle v. Rutherford*, 272 F.3d 1772, 1285 (9th Cir. 2001) (internal citations and quotations omitted) (emphasis in original).

One key issue in this case is whether Sznaider posed a threat to the officers even as he resisted the officers given that Carrillo was bearing his full weight on Sznaider's back and three other men were restraining his hips and legs. Another key issue in this case is whether Sznaider became unconscious and stopped fighting after the second application of the Taser but before the application of the carotid control hold.

"Case law has clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (citing *Tennessee*, 471 U.S. at 11. Here, indulging the version of the facts most favorable to Plaintiff, it would have been clear to a reasonable officer that applying a Taser twice to Sznaider in succession as he lay prone on the ground and restrained by four men, one of whom was placing his full weight of 200 pounds on him and had just requested that someone place

-14-

handcuffs on Sznaider, is unlawful.[2] It would also have been clearly unlawful to put a chokehold on Sznaider in that situation, especially if, as Plaintiff claims, Sznaider had stopped resisting entirely after the second Taser application. Genuine disputes of material fact thus preclude the Court from granting summary judgment to the officers on the ground of qualified immunity. *See Lolli*, 351 F.3d at 421-22 (declining to grant summary judgment to officers based upon qualified immunity because if "[the plaintiff's] version of the facts ultimately prevails, there is a reasonable likelihood that the officers would not be entitled to qualified immunity").

Accordingly, Defendants' motion for summary judgment is **DENIED** as to Plaintiff's Fourth Amendment claim and as to the officers' entitlement to qualified immunity.

**B.     Plaintiff's *Monell* Claim**

   **1.     Legal Standard**

Local governments may be sued under Section 1983, but they may not be held vicariously liable for their employees' constitutional violations. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013), *cert. denied*, No. 13-691, 2014 WL 684092 (2014) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). "Instead, a municipality is subject to suit under § 1983 only 'if it is alleged to have caused a constitutional tort though a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121, 108 S. Ct. 915, 99 L. Ed. 2d

---

[2] Defendants' reliance on *Marquez v. City of Phoenix,* 693 F.3d 1167 (9th Cir. 2012), is misplaced. That case, which found the officer's use of a Taser on a suspect not excessive, is clearly distinguishable. In *Marquez*, the officers were "greeted by a blood-spattered room, an injured adult, and a child in evident distress," which was sufficient to indicate that a serious crime had occurred. *Id.* at 1175. Moreover, at the time the Taser was deployed, the officers had not yet wrestled the suspect to the ground, as the officers here had done with Sznaider. *Id.* Rather, in *Marquez*, the suspect had enough freedom of movement to kick one of the officers in the groin as the officer reloaded and redeployed the Taser. *Id.*

1  107 (1988)). "A plaintiff seeking to establish municipal liability must demonstrate,
2  moreover, that the government 'had a deliberate policy, custom, or practice that was the
3  moving force behind the constitutional violation he suffered.'" *Id.* (quoting *Galen v.*
4  *Cnty. of L.A.*, 477 F.3d 652, 667 (9th Cir. 2007)).

5       A plaintiff may meet *Monell*'s policy or custom requirement in three ways: (1)
6  "the plaintiff may prove that a city employee committed the alleged constitutional
7  violation pursuant to a formal governmental policy or a 'longstanding practice or custom
8  which constitutes the standard operating procedure of the local government entity,'"
9  *Hopper v. City of Pasco*, 241 F.3d 1067, 1083 (9th Cir. 2001) (quoting *Jett v. Dallas*
10 *Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)); (2) "the
11 plaintiff may establish that the individual who committed the constitutional tort was an
12 official with 'final policy-making authority' and that the challenged action itself thus
13 constituted an act of official government policy" (*id.* (citing *Pembaur v. City of*
14 *Cincinnati*, 475 U.S. 469, 480-81, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986); *McKinley v.*
15 *City of Elroy*, 705 F.2d 1110, 1116 (9th Cir. 1983))); or (3) "the plaintiff may prove that
16 an official with final policy-making authority ratified a subordinate's unconstitutional
17 decision or action and the basis for it," (*id.* (citing *City of St. Louis v. Praprotnik*, 485
18 U.S. 112, 127, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988); *Cnty. of Madera*, 859 F.2d 797,
19 801-02 (9th Cir. 1988))). In order to make out a *Monell* claim, "[t]he plaintiff must show
20 both causation-in-fact and proximate causation." *Gravelet-Blondin*, 728 F.3d at 1096.

21      Here, as an initial matter, Plaintiff has not raised the City's chokehold policy or its
22 failure to train its officers properly as the basis of its *Monell* claim, thus waiving those
23 arguments. Instead, Plaintiff appears to assert a hybrid *Monell* claim in which the City's
24 practice of failing to investigate alleged excessive uses of force in effect ratified the
25 officers' actions. (Opp'n at 20-21.) To the extent that Plaintiff is arguing that the City
26 should be held liable for its practice of failing to investigate alleged uses of excessive
27 force, Plaintiff has not proffered any evidence demonstrating that a policy, custom, or
28 practice exists. To the extent that Plaintiff is contending that the City should be liable

1  because it ratified the officers' actions, Plaintiff has failed to show that "an official with
2  policy making authority" made "a deliberate choice" to ratify the officers' actions.
3  *McKay v. City of Hayward*, 949 F. Supp. 2d 971, 986 (N.D. Cal. 2013) (citing *Clouthier*
4  *v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010)).  "[T]he failure of an
5  official to take any remedial steps after the violations" can indicate a deliberate choice
6  and establish a basis for liability.  *McKay*, 949 F. Supp. 2d at 986 (quoting *Gomez v.*
7  *Vernon,* 255 F.3d 1118, 1127 (9th Cir.2001)).  Plaintiff has asserted that Lieutenant
8  Mitch Spike conducted an investigation into the incident, but Plaintiff has not identified
9  evidence showing that Spike has policy making authority.  Moreover, the evidence
10 indicates that he did in fact conduct an investigation before turning it over to the District
11 Attorney's office.

Accordingly, summary judgment is **GRANTED** as to Plaintiff's *Monell* claim.

### C.  Plaintiff's State Law Claims

Defendants contend that they are entitled to summary judgment on Plaintiff's state law claims for violation of Cal. Civ. Code § 52.1, battery, and negligence/wrongful death because California law applies the federal reasonableness standard to claims predicated on the use of excessive force, and the officers are entitled to summary judgment under federal law. (Mot. at 22-23.)  For the same reasons that the Court denies Defendants' motion for summary judgment on Plaintiff's Fourth Amendment claim, *supra*, the Court rejects this analysis.

Citing *Bay Area Rapid Transit District v. Superior Court*, 38 Cal. App. 4th 141, 44 Cal. Rptr. 2d 887 (1995), Defendants also contend that Plaintiff does not have standing to bring a claim under Cal. Civ. Code § 52.1 because the statute provides for a private right of action that is personal and does not survive death. (Mot. at 23.)  At least one court has limited the holding in *Bay Area Rapid Transit District* to "whether a parent may state their own personal claim under the Bane Act on the theory that the death of their child interfered with the parents' constitutional right to parent. *See Estate of Crawley v. Kings Cnty.*, No. 1:13-CV-02042-LJO, 2014 WL 2174848, at *11 (E.D. Cal. May 23, 2014)

(citing *Bay Area Rapid Transit Dist.*, 38 Cal. App. 4th at 144). Here, unlike the *Bay Area Rapid Transit District* plaintiffs' claim, Plaintiff's cause of action is not based solely on a violation of his own constitution rights, but also on the violation of Sznaider's constitutional rights. *See De la Torre v. City of Salinas*, No. C-09-00626 RMW, 2010 WL 3743762, at *7 (N.D. Cal. Sept. 17, 2010). The court in *Crawley* found the defendants' argument unpersuasive in light of California law that provides that the survival of claims is the rule, not the exception. 2014 WL 2174848, at *11 (citing Cal. Civ. Code § 377.20). The Court finds the *Crawley* court's reasoning persuasive and declines to grant summary judgment on Plaintiff's Cal. Civ. Code § 52.1 claim on the basis of standing.

Defendants also argue that the state law claims are precluded by state law immunities provided to governmental entities and governmental employees. (Mot. at 24 (citing Cal. Gov't Code §§ 820.2, 820.4, 856(a)).) Section 820.2 of the California Government Code states: "Except as otherwise provided by this statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of discretion vested in him, whether or not such discretion be abused." This "discretionary immunity" rule immunizes public employees from liability in performing discretionary acts within the scope of their employment, unless otherwise provided. *Reynolds v. Cnty. of San Diego*, 858 F. Supp. 1064, 1074 (S.D. Cal. 1994), *aff'd in part and remanded in part*, 84 F.3d 1162 (9th Cir. 1996). Section 820.4 of the California Government Code similarly provides: "A public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law." Section 856(a) of the California Government Code grants a public entity or a public employee acting within the scope of his employment immunity from liability for any injury resulting from the confinement of a person for mental illness or addiction.

California denies immunity, however, to police officers who use excessive force in arresting a suspect. *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002)

(citing *Mary M. v. City of Los Angeles,* 54 Cal.3d 202, 215, 285 Cal. Rptr. 99 (1991)). As the reasonableness of the officers' uses of force is a triable issue of fact, the officers are not entitled to immunity.

In light of the foregoing, Defendants' motion for partial summary judgment is **DENIED** as to Plaintiff's state law claims.

## IV.
## CONCLUSION

In light of the foregoing, Defendants' motion for partial summary judgment is **GRANTED** in part and **DENIED** in part as follows:

1. Defendants' motion as to Plaintiff's Fourth Amendment claim based on denial of timely post-arrest medical treatment is **GRANTED**;
2. Defendants' motion as to Plaintiff's Fourteenth Amendment substantive due process claim is **GRANTED**;
3. Defendants' motion on Plaintiff's entire *Monell* claim is **GRANTED**; and
4. Defendants' motion is otherwise **DENIED**.

**IT IS SO ORDERED**.

DATED: January 26, 2015

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE